Michael R. Lozeau (State Bar No. 142893)
Richard Drury (State Bar No. 163559)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
1516 Oak Street, Suite 216
Alameda, CA 94501
Tel: (510) 749-9102
Fax: (510) 749-9103 (fax)
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

Andrew L. Packard (State Bar No. 168690)
LAW OFFICES OF ANDREW L. PACKARD
319 Pleasant Street
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiffs
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE and
NORTHERN CALIFORNIA RIVER WATCH

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation; NORTHERN CALIFORNIA RIVER WATCH, a non-profit corporation,<br><br>    Plaintiffs,<br><br>    vs.<br><br>SYAR INDUSTRIES, INC., a corporation,<br><br>    Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE and NORTHERN

CALIFORNIA RIVER WATCH, by and through its counsel, hereby allege:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the

Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or

"the Act").  This Court has subject matter jurisdiction over the parties and the subject matter

COMPLAINT

1

of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.       On or about May 5, 2009, Plaintiffs provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of Plaintiffs' notice letter is attached as Exhibit A, and is incorporated by reference.

3.       More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiffs are informed and believe, and thereupon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.       Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district. Pursuant to Local Rule 3-120, intradistrict venue is proper in Sacramento, California, because the source of the violations is located within Solano County.

## II.   **INTRODUCTION**

5.       This complaint seeks relief for Defendant's discharges of polluted storm water and non-storm water pollutants from Defendant SYAR INDUSTRIES, INC.'s quarry, asphalt mixing, ready-mix concrete, and stone crushing facility located at 885 Lake Herman

COMPLAINT

1  Road in Vallejo, California ("the Facility") in violation of the Act and National Pollutant

2  Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources

3  Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order

4  No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ (hereinafter "the Order" or

5  "Permit" or "General Permit").  Defendant's violations of the discharge, treatment

6  technology, monitoring requirements, and other procedural and substantive requirements of

7  the Permit and the Act are ongoing and continuous.

8       6.    The failure on the part of persons and facilities such as Defendant and its

9  industrial facility to comply with storm water requirements is recognized as a significant

10  cause of the continuing decline in water quality of Napa River, Suisun Bay and other area

11  receiving waters.  The general consensus among regulatory agencies and water quality

12  specialists is that storm pollution amounts to more than half of the total pollution entering

13  the aquatic environment each year.  In many areas of Solano County, storm water from

14  commercial and industrial activities flows completely untreated through storm drain systems

15  or other channels directly to the waters of the United States.

16  **III.**   **PARTIES**

17       7.    Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

18  ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of

19  California with its main office in Stockton, California.  CSPA has approximately 2,000

20  members who live, recreate and work in and around waters of the State of California,

21  including Suisun Bay and the Napa River.  CSPA is dedicated to the preservation,

22  protection, and defense of the environment, the wildlife and the natural resources of all

23  waters of California.  To further these goals, CSPA actively seeks federal and state agency

24  implementation of the Act and other laws and, where necessary, directly initiates

25  enforcement actions on behalf of itself and its members.

26       8.    Members of CSPA reside in and around Suisun Bay and the Napa River and

27  enjoy using Suisun Bay and the Napa River for recreation and other activities.  Members of

28  CSPA use and enjoy the waters into which Defendant has caused, is causing, and will

COMPLAINT

continue to cause, pollutants to be discharged.  Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view wildlife and engage in scientific study including monitoring activities, among other things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to CSPA caused by Defendant's activities.

9.    Plaintiff NORTHERN CALIFORNIA RIVER WATCH ("River Watch") is a 501(c)(3) non-profit public benefit corporation duly organized under the laws of the State of California, with headquarters and main office located in Sebastopol, California.  River Watch is dedicated to protect, enhance and help restore the surface and subsurface waters of Northern California.  To further these goals, River Watch actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

10.   Members of River Watch live in Northern California and use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of River Watch have interests in the watersheds which have been, are being, or may be adversely affected by Defendant's violations of the Act as alleged in this Complaint.   Said members use the affected waters and watershed areas for domestic water, recreation, sports, fishing, swimming, hiking, photography, nature walks, religious, spiritual and shamanic practices, and the like.  Furthermore, the relief sought will redress the injury in fact to PLAINTIFF and its members, the likelihood of future injury and interference with the interests of said members.  The relief sought herein will redress the harms to River Watch caused by Defendant's activities.

11.   Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and its members, for which harm they have no plain, speedy or adequate remedy at law.

12.   Defendant SYAR INDUSTRIES, INC. ("Syar") is a corporation organized

under the laws of California.  Defendant Syar operates a quarry, asphalt mixing, ready-mix concrete, and stone crushing facility in Vallejo, California.

## IV.   **STATUTORY BACKGROUND**

13.   Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

14.   Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

15.   Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

16.   The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

17.   In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

18.   The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically

Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

19.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  The General Permit requires existing dischargers to have filed their NOIs before March 30, 1992.

20.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow

1    pattern and nearby water bodies, the location of the storm water collection, conveyance and

2    discharge system, structural control measures, impervious areas, areas of actual and potential

3    pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials

4    handled and stored at the site (Section A(5)); a description of potential pollutant sources

5    including industrial processes, material handling and storage areas, dust and particulate

6    generating activities, and a description of significant spills and leaks, a list of all non-storm

7    water discharges and their sources, and a description of locations where soil erosion may

8    occur (Section A(6)).  The SWPPP must include an assessment of potential pollutant sources

9    at the Facility and a description of the BMPs to be implemented at the Facility that will

10   reduce or prevent pollutants in storm water discharges and authorized non-storm water

11   discharges, including structural BMPs where non-structural BMPs are not effective (Section

12   A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised

13   where necessary (Section A(9),(10)).

14         21.    Section C(3) of the General Permit requires a discharger to prepare and submit

15   a report to the Regional Board describing changes it will make to its current BMPs in order

16   to prevent or reduce any pollutant in its storm water discharges that is causing or

17   contributing to an exceedance of water quality standards.  Once approved by the Regional

18   Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report

19   must be submitted to the Regional Board no later than 60 days from the date the discharger

20   first learns that its discharge is causing or contributing to an exceedance of an applicable

21   water quality standard.  Section C(4)(a).

22         22.    Section C(11)(d) of the General Permit's Standard Provisions requires

23   dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6).

24   Section A(9) of the General Permit requires an annual evaluation of storm water controls

25   including the preparation of an evaluation report and implementation of any additional

26   measures in the SWPPP to respond to the monitoring results and other inspection activities.

27         23.    The General Permit requires dischargers commencing industrial activities

28   before October 1, 1992 to develop and implement an adequate written monitoring and

1  reporting program no later than October 1, 1992.  Existing facilities covered under the

2  General Permit must implement all necessary revisions to their monitoring programs no later

3  than August 1, 1997.

4         24.     As part of their monitoring program, dischargers must identify all storm water

5  discharge locations that produce a significant storm water discharge, evaluate the

6  effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control

7  measures set out in the SWPPP are adequate and properly implemented.  Dischargers must

8  conduct visual observations of these discharge locations for at least one storm per month

9  during the wet season (October through May) and record their findings in their Annual

10 Report.  Dischargers must also collect and analyze storm water samples from at least two

11 storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall

12 collect storm water samples during the first hour of discharge from (1) the first storm event

13 of the wet season, and (2) at least one other storm event in the wet season.  All storm water

14 discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and

15 analyze during the wet season for basic parameters, such as pH, total suspended solids,

16 electrical conductance, and total organic content or oil & grease, certain industry-specific

17 parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other

18 pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii)

19 requires discharges to sample for parameters dependent on a facility's standard industrial

20 classification ("SIC") code.  Facilities that fall under SIC Code 3273 are required to analyze

21 their storm water discharge samples for iron.  Dischargers must also conduct dry season

22 visual observations to identify sources of non-storm water pollution.  Section B(7)(a)

23 indicates that the visual observations and samples must represent the "quality and quantity of

24 the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if

25 visual observation and sample collection locations are difficult to observe or

26 sample…facility operators shall identify and collect samples from other locations that

27 represent the quality and quantity of the facility's storm water discharges from the storm

28 event."

COMPLAINT

25.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

26.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

27.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  EPA has established Parameter Benchmark Values for the following parameters, among others: total suspended solids – 100 mg/L; oil & grease – 15 mg/L; total organic carbon – 110 mg/L; pH – 6.0 – 9.0 s.u.; iron – 1.0 mg/L; zinc – 0.117 mg/L; nitrate plus nitrite nitrogen ("N+N") – 0.68 mg/L; aluminum – 0.75 mg/L; copper – 0.0636 mg/L; lead – 0.0816 mg/L; and chemical oxygen demand – 120 mg/L.  The State Board has proposed a Benchmark Value for electrical conductance of 200 μmhos/cm.

28.     The Regional Board has established water quality standards for the Napa River, Suisun Bay, and the San Francisco Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred to as the Basin Plan.

29.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."

COMPLAINT

9

30.    The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses."

31.    The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."

32.    The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."

33.    The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

34.    The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."

35.    The Basin Plan establishes a dissolved oxygen standard of 7.0 mg/L for waters upstream of the Carquinez Bridge.

36.    The Basin Plan establishes a water quality objective for iron of 0.3 mg/L and for aluminum of 0.2 mg/L.

37.    The Basin Plan establishes Freshwater Water Quality Objectives for zinc of 0.120 mg/L (4-day average and 1-hour average); for copper of 0.009 mg/L (4-day average) and 0.013 mg/L (1-hour average); and for lead of 0.0025 mg/L (4-day average) and 0.065 mg/L (1-hour average).

38.    The EPA has adopted freshwater numeric water quality standards for zinc of 0.12 mg/L for both the Criteria Maximum Concentration – ("CMC") and Criteria Continuous Concentration – ("CCC"); for copper of 0.013 mg/L (CMC) and 0.009 mg/L (CCC); and for lead of 0.065 mg/L (CMC) and 0.0025 mg/L (CCC).

V.    **STATEMENT OF FACTS**

39.    Defendant Syar operates a quarry, asphalt mixing, ready-mix concrete, and stone crushing facility located at 885 Lake Herman Road in Vallejo, California.  The Facility

COMPLAINT

10

is engaged in the processing of various forms of crushed and broken stone, production of ready-mix concrete and asphaltic paving materials.  Activities at the Facility fall within SIC Codes 1429, 3273, and 2951.  The Facility covers approximately 386 acres, the majority of which is unpaved and used for processing, transporting, and storing materials throughout the Facility.  On information and belief, Plaintiffs allege that there is at least one large building located on the property.  On information and belief, Plaintiffs allege that materials processing and the movement of materials occurs both inside and outside of this building.  Stone, asphalt, concrete, and other materials are transported in and out of this building for storage and processing in the unpaved areas of the Facility.

40.     Defendant channels and collects storm water falling on the Facility through a series of storm water drains that lead to at least six storm water outfalls.  Each outfall collects storm water runoff from a particular area of the Facility.  The Facility's outfalls discharge to either Blue Rock Springs Creek or Sulphur Springs Creek.  Sulphur Springs Creek flows into Lake Herman, which then flows into Suisun Bay.  Blue Rock Springs Creek flows into Lake Chabot, which then flows into the Napa River.

41.     On information and belief, Plaintiffs allege that the industrial activities at the site include the processing, storage, and disposal of a variety of materials including sand, earth and stone, dirt and soil, asphalt, stone, concrete, and limestone.  Industrial activities also include the outdoor handling, processing, and storage of these materials as well as other materials used in the production process.

42.     Significant activities at the site take place outside and are exposed to rainfall.  These activities include the storage and movement of raw materials and finished products, equipment used in the production processes; the storage and use of vehicles and equipment for materials handling; and the storage, handling, and disposal of waste materials.  Loading and delivery of raw materials and finished products occurs outside.  Trucks enter and exit the Facility directly from and to a public road.  Trucks and fork lifts are the primary means of moving raw materials and finished products around the storage areas of the Facility.  These areas are exposed to storm water and storm flows due to the lack of overhead coverage,

berms, and other storm water controls.

43.    Industrial machinery, heavy equipment and vehicles, including trucks and fork lifts, are operated and stored at the Facility in areas exposed to storm water flows.  Plaintiffs are informed and believe, and thereupon allege, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed to storm water flows, and that such machinery and equipment track sediment and other contaminants throughout the Facility.

44.    Plaintiffs are informed and believe, and thereupon allege that the storm water flows easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease, and other pollutants as it flows toward the storm water drains.  Storm water and any pollutants contained in that storm water entering the drains flows directly to the Facility's outfalls.

45.    The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

46.    Since at least December 8, 2004, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board.  Defendant Syar certified each of those annual reports pursuant to Sections A and C of the General Permit.

47.    Since at least December 8, 2004, the Facility has detected total suspended solids and electrical conductance in storm water discharged from the Facility.  Since at least December 1, 2005, the Facility has detected iron, zinc, aluminum, copper, and N+N in storm water discharged from the Facility.  Since at least December 12, 2006, the Facility has

COMPLAINT

12

detected lead in storm water discharged from the Facility.  Since at least December 7, 2007, the Facility has detected chemical oxygen demand in storm water discharged from the Facility.  Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values and the State Board's proposed value for electrical conductance.  Levels of these pollutants detected in the Facility's storm water have been in excess of water quality standards established in the Basin Plan.

48.     The following discharges on the following dates contained concentrations of pollutants in excess of numeric water quality standards established in the Basin Plan:

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Objective | Location (as identified by the Facility) |
|---|---|---|---|---|
| 2/1/2008 | Iron | 1.2 mg/L | 0.3 mg/L | Outfall E |
| 2/1/2008 | Aluminum | 1.0 mg/L | 0.2 mg/L | Outfall E |
| 2/1/2008 | Iron | 1.2 mg/L | 0.3 mg/L | Outfall F |
| 2/1/2008 | Aluminum | 0.99 mg/L | 0.2 mg/L | Outfall F |
| 1/28/2008 | Iron | 1.7 mg/L | 0.3 mg/L | Outfall E |
| 1/28/2008 | Aluminum | 1.4 mg/L | 0.2 mg/L | Outfall E |
| 1/28/2008 | Iron | 3 mg/L | 0.3 mg/L | Outfall F |
| 1/28/2008 | Aluminum | 2.4 mg/L | 0.2 mg/L | Outfall F |
| 1/4/2008 | Iron | 56 mg/L | 0.3 mg/L | Outfall C |
| 1/4/2008 | Aluminum | 22 mg/L | 0.2 mg/L | Outfall C |
| 1/4/2008 | Copper | 0.044 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall C |
| 1/4/2008 | Copper | 0.044 mg/L | 0.013 mg/L (1-hour average) – Freshwater | Outfall C |
| 1/4/2008 | Iron | 180 mg/L | 0.3 mg/L | Outfall A |
| 1/4/2008 | Aluminum | 74 mg/L | 0.2 mg/L | Outfall A |

| 1/4/2008 | Copper | 0.13 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall A |
| 1/4/2008 | Copper | 0.13 mg/L | 0.013 mg/L (1-hour average) – Freshwater | Outfall A |
| 1/4/2008 | Lead | 0.049 mg/L | 0.0025 mg/L (4-day average) – Freshwater | Outfall A |
| 1/4/2008 | Zinc | 0.25 mg/L | 0.12 mg/L (4-day average) – Freshwater | Outfall A |
| 1/4/2008 | Zinc | 0.25 mg/L | 0.12 mg/L (1-hour average) – Freshwater | Outfall A |
| 1/4/2008 | Iron | 51 mg/L | 0.3 mg/L | Outfall B |
| 1/4/2008 | Aluminum | 22 mg/L | 0.2 mg/L | Outfall B |
| 1/4/2008 | Copper | 0.036 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall B |
| 1/4/2008 | Copper | 0.036 mg/L | 0.013 mg/L 1-hour average) – Freshwater | Outfall B |
| 1/4/2008 | Lead | 0.0044 mg/L | 0.0025 mg/L (4-day average) – Freshwater | Outfall B |
| 12/20/2007 | Iron | 6.4 mg/L | 0.3 mg/L | Outfall A |
| 12/20/2007 | Aluminum | 3 mg/L | 0.2 mg/L | Outfall A |
| 12/20/2007 | Lead | 0.0044 mg/L | 0.0025 mg/L (4-day average) – Freshwater | Outfall A |
| 12/18/2007 | Iron | 47 mg/L | 0.3 mg/L | Outfall C |
| 12/18/2007 | Aluminum | 18 mg/L | 0.2 mg/L | Outfall C |
| 12/18/2007 | Copper | 0.041 mg/L | 0.013 mg/L 1-hour average) – Freshwater | Outfall C |
| 12/18/2007 | Copper | 0.041 mg/L | 0.009 mg/L (4-day | Outfall C |

| | | | average) – Freshwater | |
|---|---|---|---|---|
| 12/7/2007 | Iron | 15 mg/L | 0.3 mg/L | Outfall B |
| 12/7/2007 | Aluminum | 6.3 mg/L | 0.2 mg/L | Outfall B |
| 12/7/2007 | Copper | 0.0094 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall B |
| 2/22/2007 | Iron | 44 mg/L | 0.3 mg/L | Outfall D |
| 2/22/2007 | Aluminum | 23 mg/L | 0.2 mg/L | Outfall D |
| 2/22/2007 | Copper | 0.071 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall D |
| 2/22/2007 | Copper | 0.071 mg/L | 0.013 mg/L 1-hour average) – Freshwater | Outfall D |
| 2/22/2007 | Lead | 0.011 mg/L | 0.0025 mg/L (4-day average) – Freshwater | Outfall D |
| 2/22/2007 | Zinc | 1 mg/L | 0.12 mg/L (4-day average) – Freshwater | Outfall D |
| 2/22/2007 | Zinc | 1 mg/L | 0.12 mg/L 1-hour average) – Freshwater | Outfall D |
| 2/22/2007 | Iron | 14 mg/L | 0.3 mg/L | Outfall C |
| 2/22/2007 | Aluminum | 5.7 mg/L | 0.2 mg/L | Outfall C |
| 2/22/2007 | Copper | 0.013 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall C |
| 2/22/2007 | Iron | 0.93 mg/L | 0.3 mg/L | Outfall F |
| 2/22/2007 | Aluminum | 0.66 mg/L | 0.2 mg/L | Outfall F |
| 2/8/2007 | Iron | 3 mg/L | 0.3 mg/L | Outfall B |
| 2/8/2007 | Aluminum | 1.3 mg/L | 0.2 mg/L | Outfall B |
| 2/8/2007 | Iron | 3.6 mg/L | 0.3 mg/L | Outfall F |
| 2/8/2007 | Aluminum | 2.7 mg/L | 0.2 mg/L | Outfall F |

| 2/8/2007 | Copper | 0.0093 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall F |
|---|---|---|---|---|
| 2/8/2007 | Iron | 0.74 mg/L | 0.3 mg/L | Outfall A |
| 2/8/2007 | Aluminum | 0.37 mg/L | 0.2 mg/L | Outfall A |
| 2/8/2007 | Iron | 2 mg/L | 0.3 mg/L | Outfall E |
| 2/8/2007 | Aluminum | 0.73 mg/L | 0.2 mg/L | Outfall E |
| 12/12/2006 | Iron | 8.8 mg/L | 0.3 mg/L | Outfall B |
| 12/12/2006 | Aluminum | 3.9 mg/L | 0.2 mg/L | Outfall B |
| 12/12/2006 | Iron | 0.59 mg/L | 0.3 mg/L | Outfall E |
| 12/12/2006 | Aluminum | 0.36 mg/L | 0.2 mg/L | Outfall E |
| 12/12/2006 | Iron | 1.3 mg/L | 0.3 mg/L | Outfall C |
| 12/12/2006 | Aluminum | 0.64 mg/L | 0.2 mg/L | Outfall C |
| 12/12/2006 | Iron | 0.69 mg/L | 0.3 mg/L | Outfall F |
| 12/12/2006 | Aluminum | 0.62 mg/L | 0.2 mg/L | Outfall F |
| 12/12/2006 | Iron | 15 mg/L | 0.3 mg/L | Outfall A |
| 12/12/2006 | Aluminum | 8.9 mg/L | 0.2 mg/L | Outfall A |
| 12/12/2006 | Copper | 0.023 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall A |
| 12/12/2006 | Copper | 0.023 mg/L | 0.013 mg/L 1-hour average) – Freshwater | Outfall A |
| 12/12/2006 | Lead | 0.01 mg/L | 0.0025 mg/L (4-day average) – Freshwater | Outfall A |
| 2/27/2006 | Iron | 8.3 mg/L | 0.3 mg/L | Outfall A |
| 2/27/2006 | Aluminum | 3.8 mg/L | 0.2 mg/L | Outfall A |
| 2/27/2006 | Copper | 0.011 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall A |
| 2/27/2006 | Iron | 26 mg/L | 0.3 mg/L | Outfall B |

COMPLAINT

16

| 2/27/2006 | Aluminum | 11 mg/L | 0.2 mg/L | Outfall B |
|---|---|---|---|---|
| 2/27/2006 | Copper | 0.018 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall B |
| 2/27/2006 | Copper | 0.018 | 0.013 mg/L (1-hour average) – Freshwater | Outfall B |
| 2/27/2006 | Iron | 1.9 mg/L | 0.3 mg/L | Outfall C |
| 2/27/2006 | Aluminum | 0.93 mg/L | 0.2 mg/L | Outfall C |
| 2/27/2006 | Iron | 8.3 mg/L | 0.3 mg/L | Outfall D |
| 2/27/2006 | Aluminum | 32 mg/L | 0.2 mg/L | Outfall D |
| 2/27/2006 | Copper | 0.019 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall D |
| 2/27/2006 | Copper | 0.019 mg/L | 0.013 mg/L (1-hour average ) – Freshwater | Outfall D |
| 2/27/2006 | Zinc | 1.7 mg/L | 0.12 mg/L (4-day average) – Freshwater | Outfall D |
| 2/27/2006 | Zinc | 1.7 mg/L | 0.12 mg/L 1-hour average) – Freshwater | Outfall D |
| 12/1/2005 | Iron | 9.5 mg/L | 0.3 mg/L | Outfall A |
| 12/1/2005 | Aluminum | 5.1 mg/L | 0.2 mg/L | Outfall A |
| 12/1/2005 | Copper | 0.012 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall A |
| 12/1/2005 | Iron | 42 mg/L | 0.3 mg/L | Outfall B |
| 12/1/2005 | Aluminum | 18 mg/L | 0.2 mg/L | Outfall B |
| 12/1/2005 | Copper | 0.026 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall B |
| 12/1/2005 | Copper | 0.026 mg/L | 0.013 mg/L (1-hour average ) – Freshwater | Outfall B |

COMPLAINT

| 12/1/2005 | Iron | 10 mg/L | 0.3 mg/L | Outfall C |
|---|---|---|---|---|
| 12/1/2005 | Aluminum | 4.7 mg/L | 0.2 mg/L | Outfall C |
| 12/1/2005 | Copper | 0.013 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall C |
| 12/1/2005 | Iron | 24 mg/L | 0.3 mg/L | Outfall D |
| 12/1/2005 | Aluminum | 11 mg/L | 0.2 mg/L | Outfall D |
| 12/1/2005 | Copper | 0.044 mg/L | 0.009 mg/L (4-day average) – Freshwater | Outfall D |
| 12/1/2005 | Copper | 0.044 mg/L | 0.013 mg/L (1-hour average ) – Freshwater | Outfall D |
| 12/1/2005 | Zinc | 1.1 mg/L | 0.12 mg/L (4-day average) – Freshwater | Outfall D |
| 12/1/2005 | Zinc | 1.1 mg/L | 0.12 mg/L 1-hour average) – Freshwater | Outfall D |

49.     The levels of total suspended solids in storm water detected by the Facility have exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA as well as the standard for suspended materials articulated in the Basin Plan.  For example, on January 4, 2008, the level of total suspended solids measured by Defendant in the Facility's discharged storm water was 1910 mg/L.  That level of total suspended solids is over nineteen times the benchmark value for total suspended solids established by EPA.  The Facility also has measured levels of total suspended solids in storm water discharged from the Facility in excess of EPA's benchmark value of 100 mg/L on December 20, 2007; December 18, 2007; February 22, 2007; February 8, 2007; December 12, 2006; February 27, 2006; December 1, 2005; January 26, 2005; December 27, 2004; and December 8, 2004.

50.     The levels of zinc in storm water detected by the Facility have exceeded the benchmark value for zinc of 0.117 mg/L established by EPA.  For example, on January 4, 2008, the level of zinc measured by Defendant in the Facility's discharged storm water was 0.25 mg/L.  That level of zinc is over twice the benchmark value for zinc established by

COMPLAINT

18

1  EPA.  The Facility also has measured levels of zinc in storm water discharged from the

2  Facility in excess of EPA's benchmark value of 0.117 mg/L on February 22, 2007; February

3  27, 2006; and December 1, 2005.

4       51.    The levels of N+N in storm water detected by the Facility have exceeded the

5  benchmark value for N+N of 0.68 mg/L established by EPA.  For example, on December 7,

6  2007, the level of N+N measured by Defendant in the Facility's discharged storm water was

7  4.5 mg/L.  That level of N+N is nearly seven times the benchmark value for N+N

8  established by EPA.  The Facility also has measured levels of N+N in storm water

9  discharged from the Facility in excess of EPA's benchmark value of 0.68 mg/L on January

10  28, 2008; January 4, 2008; December 20, 2007; February 22, 2007; February 8, 2007;

11  December 12, 2006; February 27, 2006; and December 1, 2005.

12       52.    The levels of iron in storm water detected by the Facility have exceeded the

13  benchmark value for iron of 1.0 mg/L established by EPA.  For example, on January 4,

14  2008, the level of iron measured by Defendant in the Facility's discharged storm water was

15  180 mg/L.  That level of iron is 180 times the benchmark value for iron established by EPA.

16  The Facility also has measured levels of iron in storm water discharged from the Facility in

17  excess of EPA's benchmark value of 1.0 mg/L on February 1, 2008; January 28, 2008;

18  December 20, 2007; December 18, 2007; December 7, 2007; February 22, 2007; February 8,

19  2007; December 12, 2006; February 27, 2006; and December 1, 2005.

20       53.    The levels of aluminum in storm water detected by the Facility have exceeded

21  the benchmark value for aluminum of 0.75 mg/L established by EPA.  For example, on

22  January 4, 2008, the level of aluminum measured by Defendant in the Facility's discharged

23  storm water was 74 mg/L.  That level of aluminum is almost 100 times the benchmark value

24  for aluminum established by EPA.  The Facility also has measured levels of aluminum in

25  storm water discharged from the Facility in excess of EPA's benchmark value of 1.0 mg/L

26  on February 1, 2008; January 28, 2008; December 20, 2007; December 18, 2007; December

27  7, 2007; February 22, 2007; February 8, 2007; December 12, 2006; February 27, 2006; and

28  December 1, 2005.

COMPLAINT

54.     The levels of chemical oxygen demand in storm water detected by the Facility have exceeded the benchmark value for chemical oxygen demand of 120 mg/L established by EPA.  For example, on December 7, 2007, the level of chemical oxygen demand measured by Defendant in the Facility's discharged storm water was 270 mg/L.  That level of aluminum is over twice the benchmark value for aluminum established by EPA.  The Facility also measured levels of aluminum in storm water discharged from the Facility in excess of EPA's benchmark value of 120 mg/L on January 4, 2008.

55.     The electrical conductance levels detected by the Facility in its storm water have been greater than the benchmark value of 200 μmho/cm proposed by the State Board.  For example, on December 20, 2007, the electrical conductance level measured by Defendant in the Facility's discharged storm water was 682 μmho/cm.  That electrical conductance level is over three times the State Board's proposed benchmark value.  The Facility also has measured levels of electrical conductance in storm water discharged from the Facility in excess of the proposed benchmark value of 200 μmho/cm on February 1, 2008; January 28, 2008; January 4, 2008; December 18, 2007; December 7, 2007; February 22, 2007; February 8, 2007; December 12, 2006; February 27, 2006; December 1, 2005; January 26, 2005; December 27, 2004; and December 8, 2004.

56.     On information and belief, Plaintiffs allege that since at least December 8, 2004, Defendant has failed to implement BAT and BCT at the Facility for its discharges of total suspended solids, zinc, N+N, iron, aluminum, lead, copper, chemical oxygen demand, electrical conductance, and other pollutants.  Section B(3) of the General Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

57.     On information and belief, Plaintiffs allege that since at least October 1, 2004, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for the Facility.  Plaintiffs are informed and believe, and thereupon allege, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the

COMPLAINT

Facility that are consistent with BAT or BCT for the Facility.  Plaintiffs are informed and believes, and thereupon allege, that the SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant sources, structural pollutant control measures employed by the Defendant, a list of actual and potential areas of pollutant contact, or an adequate description of best management practices to be implemented at the Facility to reduce pollutant discharges.  According to information available to CSPA and River Watch, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiffs are informed and believe, and thereupon allege, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.

58.     Information available to CSPA and River Watch indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to either Blue Rock Springs Creek or Sulphur Springs Creek.  Sulphur Springs Creek flows into Lake Herman, which then flows into Suisun Bay.  Blue Rock Springs Creek flows into Lake Chabot, which then flows into the Napa River.

59.     On information and belief, Plaintiffs allege that Defendants have failed to analyze its storm water samples for iron as required by Table D of the General Permit since on at least the following dates: January 26, 2005; December 27, 2004; and December 4, 2004.

60.     Plaintiffs are informed and believe, and thereupon allege, that, Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

61.     Plaintiffs are informed and believe that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least July 1, 2005.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit.  Plaintiffs are informed and believe, and thereupon

COMPLAINT

21

allege, that Defendant has signed incomplete annual reports that purported to comply with the General Permit when there was significant noncompliance at the Facility.

62.    Information available to Plaintiffs indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

63.    Plaintiffs re-allege and incorporate Paragraphs 1-62, as if fully set forth herein.

64.    The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of suspended solids, zinc, N+N, iron, aluminum, lead, copper, chemical oxygen demand, electrical conductance, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

65.    Each day since October 1, 2004, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

66.    Defendant has been in violation of the BAT/BCT requirements every day since October 1, 2004.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement an adequate BAT/BCT for the Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

67.    Plaintiffs re-allege and incorporate Paragraphs 1-66, inclusive, as if fully set

forth herein.

68.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

69.     Plaintiffs are informed and believe, and thereupon allege, that since at least October 1, 2004, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

70.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with suspended solids, zinc, N+N, iron, aluminum, lead, copper, chemical oxygen demand, electrical conductance, and other un-monitored pollutants at levels above applicable water quality standards.  The storm water then flows untreated from the Facility into either Blue Rock Springs Creek or Sulphur Springs Creek.  Sulphur Springs Creek flows into Lake Herman, which then flows into Suisun Bay.  Blue Rock Springs Creek flows into Lake Chabot, which then flows into the Napa River.

71.     Plaintiffs are informed and believe, and thereupon allege, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

72.     Plaintiffs are informed and believe, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

73.     Every day since at least October 1, 2004, that Defendant has discharged and

continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

74.     Plaintiffs re-allege and incorporate Paragraphs 1-73, as if fully set forth herein.

75.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

76.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's outdoor storage of various materials without appropriate best management practices; the continued exposure of significant quantities of various materials to storm water flows; the continued exposure and tracking of waste resulting from the operation or maintenance of vehicles at the site, including trucks and forklifts; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values.

77.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

78.     Each day since October 1, 2004, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

79.     Defendant has been in violation of the SWPPP requirements every day since October 1, 2004.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

### FOURTH CAUSE OF ACTION
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**

COMPLAINT

24

**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

80.   Plaintiffs re-allege and incorporate Paragraphs 1-79, inclusive, as if fully set forth herein.

81.   Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

82.   Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to analyze storm water samples for iron as well as their data obtained from the monitoring program, which represents violations of Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit, and that Plaintiffs allege is not representative of the quality of the Facility's storm water discharges

83.   Each day since October 1, 2004, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FIFTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

84.   Plaintiffs re-allege and incorporate Paragraphs 1-83, as if fully set forth herein.

85.   Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least July 1, 2005.

86.   Each day since at least July 1, 2005 that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification

1  of its compliance with the General Permit.

2  **VII.   RELIEF REQUESTED**

3       Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

4            a.   Declare Defendant to have violated and to be in violation of the Act as
5  alleged herein;

6            b.   Enjoin Defendant from discharging polluted storm water from the Facility
7  unless authorized by the Permit;

8            c.   Enjoin Defendant from further violating the substantive and procedural
9  requirements of the Permit;

10            d.   Order Defendant to immediately implement storm water pollution control
11  and treatment technologies and measures that are equivalent to BAT or BCT and prevent
12  pollutants in the Facility's storm water from contributing to violations of any water quality
13  standards;

14            e.   Order Defendant to comply with the Permit's monitoring and reporting
15  requirements, including ordering supplemental monitoring to compensate for past monitoring
16  violations;

17            f.   Order Defendant to prepare a SWPPP consistent with the Permit's
18  requirements and implement procedures to regularly review and update the SWPPP;

19            g.   Order Defendant to provide Plaintiffs with reports documenting the quality
20  and quantity of their discharges to waters of the United States and their efforts to comply with
21  the Act and the Court's orders;

22            h.   Order Defendant to pay civil penalties of $32,500 per day per violation for
23  all violations occurring through January 12, 2009, and $37,500 per day per violation for all
24  violations occurring after January 12, 2009, for each violation of the Act pursuant to Sections
25  309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

26            i.   Order Defendant to take appropriate actions to restore the quality of waters
27  impaired or adversely affected by their activities;

28            j.   Award Plaintiffs' costs (including reasonable investigative, attorney, witness,

COMPLAINT

compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.  Award any such other and further relief as this Court may deem appropriate.

Dated: October 1, 2009                    Respectfully submitted,

LOZEAU DRURY LLP


By:      /s/ Douglas J. Chermak
         Douglas J. Chermak
         Attorneys for Plaintiffs
         CALIFORNIA SPORTFISHING PROTECTION
         ALLIANCE and
         NORTHERN CALIFORNIA RIVER WATCH

COMPLAINT

27